IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BREEDEN MEDIA LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:24-cv-00723 |
| ) | Judge Aleta A. Trauger |
| THE DAILY WIRE, LLC, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

The Daily Wire, LLC ("defendant" or "Daily Wire") has filed a Motion to Dismiss (Doc. No. 17), to which Breeden Media LLC ("plaintiff" or "Breeden Media") has filed an Opposition (Doc. No. 23), and the defendant has filed a Reply (Doc. No. 25). For the reasons set out herein, the Motion to Dismiss will be denied.

I.  BACKGROUND[1]

A.  Nature of the Case

This is a copyright infringement case brought under the Copyright Act, 17 U.S.C. § 101 *et seq*. (Doc. No. 1 ¶ 1.) The Complaint alleges that the plaintiff owns rights in a video ("video") of migrants rushing the United States border, which received copyright registration on April 4, 2024. (*Id.* ¶¶ 2–6, 12–21.) The Complaint further alleges that the defendant copied and displayed the video on its website and various social media platforms, including X,[2] without permission. (*See generally id.*). The Complaint also alleges that the defendant received a financial benefit for

---

[1] Unless otherwise indicated, these facts come from the Complaint (Doc. No. 1) and are taken as true for the purposes of the pending motion.
[2] X is a social medium formerly known as Twitter. *See generally Twitter*, WIKIPEDIA, https://en.wikipedia.org/wiki/Twitter (last visited Dec. 26, 2024).

1

copying and displaying the video, insofar as "a large number of people" watched it, thereby increasing traffic to the plaintiff's website and social media accounts and generating "advertising and/or business revenues." (*See id.* ¶¶ 49–53.) According to the Complaint, this allegedly unlawful use "harmed the . . . market for the video." (*Id.* ¶ 55.) On this basis, the Complaint brings a claim for direct copyright infringement and alleges that "Plaintiff is entitled to an award of actual damages and disgorgement of all . . . profits attributable to the infringements" or, alternatively, "statutory damages . . . for each infringement." (*Id.* ¶ 69.) Finally, the Complaint alleges that the plaintiff is "entitled to injunctive relief" and asks for reasonable attorneys' fees and costs. (*Id.* ¶¶ 70–71.)

### B. The Parties

Plaintiff Breeden Media is a Texas limited liability company whose principal place of business is in Dallas, Texas. (*Id.* ¶ 7.) Breeden Media is a "professional videography company" and the "owner of certain videos which [it] commercially licenses." (*Id.* ¶ 12.) Defendant Daily Wire is a Texas limited liability company whose principal place of business is in Nashville, Tennessee. (*Id.* ¶ 8.) Daily Wire is "a sophisticated media company which owns a comprehensive portfolio of digital marketing platforms and has advanced operational and strategic expertise in the industry." (*Id.* ¶ 30.) Daily Wire's staff has "significant experience in copyright matters and [is] familiar with specific journalistic practices" pertaining to licensing. (*Id.* ¶ 31.)

### C. Procedural History

On June 13, 2024, the plaintiff filed its Complaint (Doc. No 1.) The Complaint contains a single count for direct copyright infringement under 17 U.S.C. § 501 *et seq*. (*See id.* ¶¶ 62–71.) On August 8, 2024, the defendant filed its Motion to Dismiss. (Doc. No. 17.) On September 12,

2024, the plaintiff filed an Opposition to the Motion to Dismiss. (Doc. No. 23.) On September 26, 2024, the defendant filed a Reply. (Doc. No. 25.)

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

3

## III.     ANALYSIS

### A.     Direct Copyright Infringement (Count I)

The Copyright Act provides protection for original works of authorship expressed in various media. *See* 17 U.S.C. §§ 101–1332. Generally, the owner of a copyright has the exclusive rights (1) to "reproduce the copyrighted work"; (2) to "prepare derivative works"; (3) to "distribute copies"; (4) to "perform the copyrighted work publicly"; and (5) to "display the copyrighted work publicly." 17 U.S.C. § 106(1)–(6). "A plaintiff may bring a claim against a person who infringes any of the plaintiff's exclusive rights in a copyright under § 106 by demonstrating two elements: '(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original.'" *Stromback v. New Line Cinema*, 384 F.3d 283, 293 (6th Cir. 2004) (quoting *Feist Publ'ns. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)); *accord Enchant Christmas Light Maze & Mktv. Glowco* 958 F.3d 532, 536 (6th Cir. 2020); *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003).

The defendant makes multiple arguments in support of dismissing the infringement claim. First, the defendant argues that it had a license based upon X's terms of service. (Doc. No. 18 at 6–8.) Second, the defendant argues that the plaintiff lacks statutory standing because the prior owner of the rights in the video relinquished them. (*Id.* at 8–9.) Third, the defendant argues that its use of the video constituted fair use. (*Id.* at 9–16.) As a preliminary matter, the plaintiff counters that the above arguments are not proper on a 12(b)(6) motion. The court will address these arguments in turn.

#### 1.     Propriety of Arguments

The plaintiff contends that the defendant's arguments, *i.e.*, license and lack of statutory standing, are not proper on a 12(b)(6) motion, insofar as they are essentially unpled affirmative

4

defenses. (*See* Doc. No. 23 at 6–7.) The court disagrees. It is well established that "[a] defendant may raise a complete defense to a copyright infringement claim by presenting the court with the license or sublicense on a motion to dismiss." *Pugh v. Norman*, No. 3:16-cv-02075, 2017 WL 712751, at *6 (M.D. Tenn. Feb. 23, 2017) (Brown, M.J.) (quoting *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 121 (S.D.N.Y. 2015)), *report and recommendation adopted*, No. 16–02075, 2018 WL 731807 (M.D. Tenn. Feb. 6, 2018); *see also Ariel v. Reuters Grp.*, No. 05 Civ. 9646(JFK), 2006 WL 3161467, at *5 (S.D.N.Y. Oct. 31, 2006) ("Even though a defendant's status as a valid licensee may be characterized as an affirmative defense, such defenses also may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) . . . ." (internal quotation marks and citations omitted)), *aff'd*, 277 F. App'x 43 (2d Cir. 2008). Similarly, lack of statutory standing is a proper argument on a 12(b)(6) motion. *See Roberts v. Hamer*, 655 F.3d 578, 581 (6th Cir. 2011); *accord Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1001 (9th Cir. 2015); *Maya v. Centex*, 658 F.3d 1060, 1067 (9th Cir. 2011).

Therefore, the court will examine the defendant's arguments.

    2.    <u>License</u>

The defendant argues that, prior to the events leading to this lawsuit, third parties posted the video on X, the terms of service ("TOS") of which authorized the defendant's subsequent use. (*See* Doc. No. 18 at 6–8). The plaintiff, on the other hand, argues that (i) the court may not consider the TOS; and (ii) the TOS are too ambiguous to establish the existence of a license in favor of the defendant at the pleadings stage. (Doc. No. 23 at 7–11.)

    i.    *Judicial Notice*

The plaintiff argues that the court may not judicially notice the TOS, "insofar as they are not referenced in the Complaint nor central to Plaintiff's claim." (Doc. No. 23 at 8.) Courts,

5

however, may judicially notice facts not subject to reasonable dispute, including contents of a website. *See New England Health Care Emps. Pension Fund v. Ernst & Young,* 336 F.3d 495, 501 (6th Cir. 2003) ("A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice"); Fed. R. Evid. 201 (providing that "[a] court may take judicial notice, whether requested or not" of a "judicially noticed fact" which "must be one not subject to reasonable dispute," a requirement satisfied if the fact is "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); *see, e.g.*, *City of Monroe Emps. Ret. Sys. v. Bridgestone,* 399 F.3d 651, 655 (6th Cir. 2005) (taking judicial notice of the contents of a website pursuant to Federal Rule of Evidence 201).

Here, the defendant implicitly requests that the court take judicial notice of the TOS. (*See* Doc. No. 18 at 2 n.1 ("Courts routinely take judicial notice of terms of service." (quoting *Zhang v. Twitter*, No. 23-cv-00980-JSC, 2023 WL 5493823, at *1 (N.D. Cal. Aug. 23, 2023)))). Despite the informal nature of this footnoted request, the court will judicially notice the TOS *sua sponte* for the sake of judicial efficiency. In addition, the court will judicially notice the alleged unlawful displays of the video, which are referenced in the Complaint and clearly central to the infringement claim. (*See* Doc. No. 1 ¶¶ 35–36 (URL links); Doc. No. 1-2 (screenshots)). Finally, the court will take judicial notice *sua sponte* of the fact that unlawful border crossings were a matter of public concern at the time of the alleged infringements.

     ii.  *Sub-License*

"A defendant may raise a complete defense to a copyright infringement claim by presenting the court with the license or sublicense on a motion to dismiss, and '[d]ismissal of a claim for

copyright infringement is proper where a contract underlying the suit clearly and unambiguously demonstrates the existence of the defendant's license to exploit the plaintiff's copyrights and where plaintiff has not shown any limitation on that license.'" *Pugh*, 2017 WL 712751 at *6 (quoting *Spinelli*, 96 F. Supp. 3d at 121).

Here, in support of its argument that the TOS authorized its use of the video, the defendant quotes the following language from the TOS:

> **There are Intellectual Property Licenses in these Terms:** You retain ownership and rights to any of your Content you post or share, and you provide us with a broad, royalty-free license to make your Content available to the rest of the world and to let others do the same . . . .
>
> By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods now known or later developed (for clarity, these rights include, for example, curating, transforming, and translating). This license authorizes us to make your Content available to the rest of the world and to let others do the same.

(Doc. No. 18 at 6–7 (emphasis in original).)[3] As the court understands it, the defendant's argument is that the above language grants a sub-license to anyone using content previously posted on X. (*See id.* at 6–9; Doc. No. 25 at 1–2.) The plaintiff counters that the TOS and other potentially applicable policies contain additional requirements and restrictions regarding sub-licensing, which "raise innumerable questions of fact" with respect to the defendant's use of the video. (Doc. No. 23 at 8–11.)

The court agrees with the plaintiff. Indeed, the TOS are simply not clear and unambiguous enough for the court to infer the existence of a sub-license at this stage of the litigation. Even leaving aside other potentially applicable provisions of the TOS and the many policies it

---

[3] The TOS at issue here are those in effect at the relevant time. *Cf. Terms of Service*, X, https://x.com/en/tos/previous/version_19 (Sep. 20. 2023).

incorporates by reference, the language on which the defendant relies states that "you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) . . . [which] authorizes us to make your Content available to the rest of the world and to let others do the same." While this language might be sufficient to infer a license in favor of X, it does not by itself confer rights to "others." And nothing indicates that X granted a sub-license to the defendant, especially for use on other platforms. Without more, the court must therefore reject the defendant's argument.

3. Statutory Standing

It is well settled that, "to have standing to bring suit, a party must have some ownership rights over at least part of the exclusive right for which he wishes to sue." *Warner/Chappell Music v. Blue Moon Ventures*, No. 3:10–1160, 2011 WL 662691, at *3 (M.D. Tenn. Feb. 14, 2011) (Campbell, J.). This includes owners, joint owners, beneficial owners, and exclusive licensees. *See id.* at *4; *Parker v. Hinton*, No. 22-5348, 2023 WL 370910, at *3 (6th Cir. Jan. 24, 2023); *Bluewater Music Servs. v. Spotify USA*, No. 3:17-cv-01051-JPM, 2018 WL 4714812, at *2 (M.D. Tenn. Sept. 29, 2018) (McCalla, J.). This, however, does not include non-exclusive licensees. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996) (noting that "a person holding a nonexclusive license has no standing to sue for copyright infringement" (citing Paul Goldstein, I *Copyright: Principles, Law and Practice* § 4.4.1.1, at 409 (1989))). The rationale underlying this rule is that the grant of a non-exclusive license is not a "transfer of copyright ownership." *See* 17 U.S.C. § 101; *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998). To succeed on its statutory standing argument, the defendant must therefore show that the plaintiff has entirely relinquished the exclusive rights at issue, which cannot be established by the grant of a non-exclusive license.[4]

---

[4] This is not to say that the grant of an exclusive license would necessarily suffice.

Relying on the same TOS language as in its sub-license argument (*see supra*, Section III.A.2.ii), the defendant argues that the plaintiff lacks statutory standing because a prior owner of copyrights in the video "relinquished certain exclusive rights . . . when he posted the video on X." (Doc. No. 18 at 8.) By operation of the TOS, the defendant contends, the prior owner was therefore unable to assign those rights to the plaintiff. (*See id.* at 8–9). The plaintiff counters that posting the video on X did not constitute a relinquishment of copyrights. (*See* Doc. No. 23 at 11). The court agrees with the plaintiff.

Indeed, the plain language of the TOS merely states that, by posting content, users grant X a "non-exclusive . . . license." (Doc. No. 18 at 6–7). Based on this language, the court cannot find that posting content on X amounts to a total relinquishment of exclusive rights. And, to the extent the defendant wishes the court to construe the TOS beyond their plain meaning, doing so would be premature at this stage. *See Thunder Roads Mag./Thunder Publ'g v. Smith*, No. 3:23-cv-00395, 2023 WL 8532696, at *7 (M.D. Tenn. Dec. 8, 2023) (Richardson, J.) (noting that, "when a contract is ambiguous, a court should not interpret the contract at the motion to dismiss stage"); *Nashville Underground* v. *AMCO Ins. Co.*, 523 F. Supp. 3d 1006, 1011 (M.D. Tenn. 2021) (Richardson, J.) (same).

    4.    <u>Fair Use</u>

Next, the defendant argues that its use of the video was fair as a matter of law. (*See* Doc. No. 18 at 9–16; Doc. No. 25 at 2–5). The plaintiff counters that it is rarely appropriate for a court to consider fair use on a motion to dismiss and that, in any event, the use was not fair. (*See* Doc. No. 23 at 11–19).

"The purpose of the fair-use doctrine is to ensure that courts 'avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed

9

to foster.'" *Zomba Enters. v. Panorama Recs.*, 491 F.3d 574, 581 (6th Cir. 2007) (quoting *Princeton Univ. Press v. Mich. Document Servs.*, 99 F.3d 1381, 1385 (6th Cir. 1996)). Section 107 of the Copyright Act provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. Section 107 further instructs courts to consider four factors to determine fair use: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Id.* "Whether a defendant's use was 'fair' ultimately involves a 'case-by-case' determination guided, non-exclusively, by the four factors discussed above." *House of Bryant Publ'ns, v. A & E Television Networks*, No. 3:09-0502, 2009 WL 3673055, at *5 (M.D. Tenn. Oct. 30, 2009) (quoting *Harper & Row Publishers* v. *Nation Enters.*, 471 U.S. 539, 549 (1985)). Finally, "[t]he scope of the fair use doctrine is wider when the use relates to issues of public concern." *Nat'l Rifle Ass'n v. Handgun Control Fed'n*, 15 F.3d 559, 562 (6th Cir. 1994).

Courts can examine the question of fair use at the motion to dismiss stage when the issue is readily apparent on the face of the pleadings. *See Balsley v. L.F.P.*, No. 1:08 CV 491, 2008 WL 11378897, at *3 (N.D. Ohio Dec. 2, 2008) ("[T]he fair use defense can support a pre-answer motion to dismiss only if the facts supporting it are readily apparent."); *Brilliance Audio*, v. *Haights Cross Commc'ns*, No. 1:04-CV-396, 2004 WL 3132255, at *6 (W.D. Mich. Dec. 30, 2004) ("[T]he Court rejects [Plaintiff's] argument that Defendants may not raise their fair use and first sale arguments by way of a Rule 12(b)(6) motion."), *aff'd in relevant part*, 474 F.3d 365 (6th Cir. 2007); *e.g.*, *House of Bryant Publ'ns*, 2009 WL 3673055 at *4 (analyzing fair use on a 12(b)(6)

10

motion); *Payne v. Courier-J.*, No. 3:04CV-488-R, 2005 WL 1287434, at *5 (W.D. Ky. May 31, 2005) (dismissing infringement claim on a 12(b)(6) motion based on fair use), *aff'd*, 193 F. App'x 397 (6th Cir. 2006). And despite the plaintiff's argument to the contrary (*cf.* Doc. No. 23 at 12), there is no indication that the Supreme Court's decision in *Andy Warhol Foundation for the Visual Arts v. Goldsmith*, 598 U.S. 508 (2023), has changed this rule. *See, e.g.*, *Santos v. Kimmel*, No. 24cv1210 (DLC), 2024 WL 3862149, at *3 (S.D.N.Y. Aug. 19, 2024) (dismissing copyright claims on a 12(b)(6) motion based on fair use); *McGillvary v. Netflix*, No. 2:23-cv-01195-JLS-SK, 2024 WL 3588043, at *9 (C.D. Cal. July 30, 2024) (same); *Strom v. Petershagen*, No. 2:24-cv-00583-BAT, 2024 WL 3638056, at *8 (W.D. Wash. Aug. 2, 2024) (same); *Atari Interactive. v. State Farm Mut. Auto. Ins. Co.*, No. 3:24-CV-0704-D, 2024 WL 4343050, at *2 (N.D. Tex. Sept. 27, 2024) ("In the copyright realm, fair use is an affirmative defense that can support Rule 12(b)(6) dismissal." (quoting *Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 320 (5th Cir. 2022)); *see also In Lux Rsch. v. Hull McGuire*, No. 23-523 (JEB), 2024 WL 774858, at *3 (D.D.C. Feb. 26, 2024) (noting that fair use can be decided before discovery in exceptional cases).

Here, the Complaint alleges that the defendant is a "media company" that engages in journalism. (Doc. No. 1 ¶¶ 30–31.) In addition, the Complaint contains detailed allegations about the defendant's allegedly infringing use of the video, the defendant's familiarity with copyright law, and the allegedly willful nature of the defendant's conduct. (*See id.* ¶¶ 22–61). The Complaint also contains links to and screenshots of the alleged infringing use, which the court has judicially noticed. (*See id.*; Doc. No. 1-2 at 1–3.) Further, the Complaint alleges harm to the market for the video. (*Id.* ¶¶ 55–56.) The court finds that, taken together, these allegations suffice to raise the issue of fair use. *See* 17 U.S.C. § 107 (listing "news reporting" as an illustrative example of fair use); *Andy Warhol Foundation*, 598 U.S. at 528 (observing that news reporting is among "the sorts

of copying that courts and Congress most commonly ha[ve]most found to be fair use" (quoting *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 577 (1994))); *House of Bryant Publ'ns*, 2009 WL 3673055 at *4–5 (issue of fair use raised by a judicially noticeable copy of the video at issue). Therefore, the court will analyze the fair use factors.

> i. *Purpose and Character of the Use*

"In evaluating the purpose and character of the use of the work at issue, we consider whether the new work is 'transformative,' and whether the use of that work is for commercial or noncommercial purposes." *Zomba Enters*. 491 F.3d at 582 (quoting *Campbell*, 510 U.S. at 570). "In considering whether a work is 'transformative,' the court should explore whether the new work 'merely supersedes the objects of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message.'" *House of Bryant Publ'ns*, 2009 WL 3673055 at *5 (citing *Campbell*, 491 F.3d at 579). "[G]iven that much of the creative work performed in this country is done for commercial purposes, this second point tends to take on less significance, especially when the new work is highly transformative." *Id.* at *5 (citing *Zomba Enters*., 491 F.3d at 582).

Citing Second Circuit law, the defendant argues that there is a "strong presumption" of fairness when the use is news reporting. (Doc. No. 18 at 9 (citing *Brody*, 2023 WL 2758730, at *3 (S.D.N.Y. Apr. 3, 2023))). But, for good reasons, not all courts within this Circuit have applied this presumption. *Compare Payne*, 2005 WL 1287434 at *3 (rejecting the idea of a presumption); *with Higgins v. Detroit Educ. Television Found.*, 4 F. Supp. 2d 701, 705 n.7 (E.D. Mich. 1998) (acknowledging the existence of the presumption under Second Circuit law and, based thereon, finding that the first factor favored the defendant). Indeed, while the Copyright Act expressly mentions news reporting as an example of fair use (*see* 17 U.S.C. § 107), the Supreme Court has

rejected the idea of a presumption. *See Campbell*, 510 U.S. at 570 (describing any "claim that any use for news reporting should be presumed fair" as "hopeful"); *Harper & Row Publishers*, 471 U.S. 539 at 561 (noting that "[t]he drafters [of the Copyright Act] resisted pressures from special interest groups to create presumptive categories of fair use"). But even in the absence of a presumption, it relevant that the use is for news reporting. *See Andy Warhol Found.*, 598 U.S. at 528 (noting that purposes listed in section 107 "may guide the first factor inquiry" because courts most commonly find them to be fair use); *e.g.*, *Castle v. Kingsport Publ'g*, No. 2:19-CV-00092-DCLC, 2020 WL 7348157, at *5–6 (E.D. Tenn. Dec. 14, 2020) (weighing heavily that the use was news reporting).

Here, the defendant argues that the use was transformative because it was news reporting, addressed a matter of public concern, and was part of a longer podcast that included spoken and written commentary about the video, which was ultimately designed to discuss national security and criticize the government's immigration policies. (*See* Doc. No. 18 at 9–12). The plaintiff counters that the intended purpose of the video is identical to the defendant's use, *i.e.*, news reporting. (*See* Doc. No. 23 at 14). On this basis, the plaintiff claims that the use was not sufficiently transformative. (*See id.* at 14–15). The court agrees with the plaintiff.

The parties cite a handful of instructive cases. In *Castle*, a sister district found that the use of a photograph in news reporting was transformative where the defendant used the photograph to present a contrary point of view to the one expressed by the plaintiff in the picture. *See Castle*, 2020 WL 7348157, at *5–6. The court noted that the defendant did more than "merely illustrate a news story about the subject matter depicted in the image," insofar as the news story was about the rebuttal of the plaintiff's point of view on a matter of public concern. *See id.* In other words, the news reporting did not use the photograph as an "illustrative aid" to report on the subject matter

13

of the photograph, but rather to report on criticism about the significance of the photograph itself. *See id.* Similarly, in *Walsh v. Townsquare Media*, another district court noted that a transformative use must communicate "something new." 464 F. Supp. 3d 570, 580 (S.D.N.Y. 2020) (quoting *Authors Guild v. Google*, 804 F.3d 202, 214 (2d Cir. 2015)). As such, the court opined, "it is not fair use to republish a photograph of a celebrity or public figure intended to generically accompany an article about that person or to describe the event depicted in the photograph." *Id.* at 581 (collecting cases). Conversely, the court noted that reporting about the viral nature of a video or the commentary about the artistic merit or appropriateness of a photograph can be transformative. *See id.* (collecting cases). Ultimately, the court found that the defendant's use was transformative because it was for "an entirely different purpose than [the photograph had] originally [been] intended [for]." *Id.* In *Murphy v. Millennium Radio Group*, the Third Circuit distinguished the use of a photograph for the purpose of reporting on the same events it depicts (not transformative) from using the photograph to report on the controversy it itself generates (transformative). *See* 650 F.3d 295, 307 (3d Cir. 2011). Finally, in *City of Inglewood v. Teixeira*, another district distinguished the use of heavily edited short portions of recordings of city council meetings used to support the defendant's political criticism of the council's activities (transformative) from the publication of entire works with mere ancillary commentary for the primary purpose of publishing those works (not transformative). *See* No. CV1501815MWFMRWX, 2015 WL 5025839, at *8–9 (C.D. Cal. Aug. 20, 2015).

      Here, the plaintiff claims that the defendant used the video as part of a broadcast on "migration and other issues," during which its journalist expressed an opinion about the "violent mob pushing through the border and through the National Guard" and "criticiz[ed] the government's immigration policy and explain[ed] his view of the issue as a matter of national

14

security." (Doc. No. 18 at 11–12). After reviewing the relevant portion of the defendant's broadcast, the court agrees with this characterization. The court also notes that the relevant portion of the broadcast has three separate parts: 1) a discussion of the context leading to the events depicted in the video superposed with a screenshot thereof, 2) a display of an unedited portion of the video without commentary, and 3) commentary about the government's border policies. *See* The Matt Walsh Show (@MattWalshShow), X (Mar. 22, 2024), https://x.com/MattWalshShow/status/1771235461479977055?t=115. Before playing the unedited portion of the video, the journalist states, "before we play the news report [*i.e.*, the commentary], here's the actual raw footage of [the contents of the video]." *Id.*

Based on the above, the court finds that the defendant used an unedited portion of the video to illustrate, describe, or report on the events depicted therein, and/or as a vehicle to critique the government's border policies, not to report on a controversy generated by the video itself or contradict a point of view it expresses. Because the Complaint at least implies that the purpose of the video was precisely to report on the events it depicts (*see* Doc. No. 1 ¶¶ 2, 20), the court finds that the use was not transformative. Taking the allegations in the Complaint as true, the court also easily finds that the purpose of the use was commercial. (*See id.* ¶¶ 22–58).

The first factor therefore weighs in favor of the plaintiff.

### ii. Nature of the Copyrighted Work

"Courts . . . consider[] two aspects of the work in evaluating this factor: first, the extent to which it is a creative work enjoying broader copyright protection as opposed to a factual work requiring broader dissemination, and second, whether it is unpublished, in which case the right of first publication is implicated." *Balsley v. LFP*, 691 F.3d 747, 759 (6th Cir. 2012) (quoting *Nunez v. Caribbean Int'l News*, 235 F.3d 18, 23 (1st Cir. 2000)). Given that the plaintiff published the

video first, the right of first publication is not implicated. (*See* Doc. No. 1 ¶ 16.) The court will therefore only look at whether the work is factual or creative. And because the parties agree that the work is factual in nature (*see* Doc. No. 18 at 12; Doc. No. 23 at 16; Doc. No. 25 at 4), the court finds that this factor weighs in favor of the defendant.

        *iii.*      *The Amount and Substantiality of the Portion Used*

"This factor focuses on the amount of the allegedly infringed work . . . that was taken by the alleged infringer." *House of Bryant Publ'ns*, 2009 WL 3673055, at *7 (citing *Zomba Enters.*, 491 F.3d at 583). "[T]he larger the volume . . . of what is taken, the greater the affront to the interests of the copyright owner, and the less likely that a taking will qualify as a fair use." *Zomba Enters.*, 491 F.3d at 583 (citing *Princeton Univ. Press*, 99 F.3d at 1389). "[T]he court should consider both the 'quantity' and . . . the 'value' of the materials taken[;] that is, the court should consider whether the amount taken was 'reasonable in relation to the purpose of the copying.'" *House of Bryant Publ'ns*, 2009 WL 3673055, at *7 (quoting *Campbell*, 510 U.S. at 586).

Here, the parties agree that the defendant used 29 seconds of the video which, according to the plaintiff's Opposition, is 39 seconds long. (*See* Doc. No. 18 at 13; Doc. No. 23 at 16–17; Doc. No. 25 at 4–5.) But because the Complaint does not allege a specific length and the record does not contain a full copy, the court cannot conclusively determine what portion was used. For the same reason, the court cannot determine whether the use was reasonable in relation to the purpose of the copying. As such, the court finds that this factor is neutral, at least at this stage.

        *iv.*      *Effect on the Potential Market for the Copyrighted Work*

When the challenged use is commercial in nature, the burden of proof as to market effect rests with the alleged infringer. *Princeton Univ. Press*, 99 F.3d at 1386. Put differently, "where, as here, 'the copying at issue is commercial in nature, the alleged infringer bears the burden of

proving . . . that its copying does not adversely affect the market value' of the plaintiff's copyrights." *House of Bryant Publ'ns*, 2009 WL 3673055, at *8 (quoting *Zomba Enters.*, 491 F3d at 583). This factor further "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (quotation marks omitted). "[W]here 'the copyright holder clearly does have an interest in exploiting a licensing market and especially where the copyright holder has actually succeeded in doing so,' the fact that the defendant's use deprived the plaintiff of licensing revenues it would have otherwise received is relevant to the fair use analysis." *House of Bryant Publ'ns*, 2009 WL 3673055, at *8 (quoting *Princeton Univ. Press*, 99 F.3d at 1387).

The defendant argues that this factor weighs in its favor for six reasons. First, relying on a portion of a case discussing a different factor, the defendant claims that any market harm is negligible because the video "has been broadcast and rebroadcast over 18,000 times on numerous websites by news organizations, news commentators, and others." (Doc. No. 18 at 14). This argument fails because it relies on assumptions (*e.g.*, no licensing) as well as facts outside of the record, which the court may not consider at this stage. It also fails because the court must accept as true the plaintiff's allegations that it licenses the video and that, "if widespread," the defendant's use "would harm [the] potential market for the video." (Doc. No. 1 ¶¶ 12, 17, 20, 53, 56); *see House of Bryant Publ'ns*, 2009 WL 3673055 at *9.

Second, the defendant argues that, because the video appears "in the middle of a much broader broadcast," market competition is "implausible." (Doc. No. 18 at 14). The court rejects this argument, insofar as it is based upon a misunderstanding of the alleged market. Indeed, the

17

alleged market consists in licensing the video to news media. And the court finds it plausible that, if widespread, the conduct would negatively impact said market. In addition, the URL links the court judicially noticed contain sub-links leading directly to the allegedly infringing portion of the podcast. *See, e.g.,* The Matt Walsh Show (@MattWalshShow), X (Mar. 22, 2024), https://x.com/MattWalshShow/status/1771235461479977055?t=115.

Third, the defendant argues that this factor weighs in its favor because it attributed the video to the plaintiff. (Doc. No. 18 at 15). In support of this argument, the defendant cites an out-of-circuit case in which the court relied on the plaintiff's failure to allege that the publication of a small quote of a book harmed the potential market for the book itself, opining that, "[i]f anything, the small portion of the book quoted in the article acted as an advertisement." *Bell v. Magna Times*, No. 2:18CV497DAK, 2019 WL 1896579, at *5 (D. Utah Apr. 29, 2019). This argument is misguided because the Complaint here alleges market harm. In addition, nothing indicates that the use could have served as advertisement. Rather, the facts raise a substitution issue, insofar as users who saw the video on the defendant's podcast are less likely to seek to re-watch it elsewhere, potentially diminishing upstream licensing demand.

The fourth and fifth arguments are that the market value of the video is "approximately zero" because the plaintiff has "granted an unlimited, sublicensable license to X" (Doc. No. 18 at 16) and that the Complaint fails to allege market harm in a non-conclusory manner (Doc. No. 25 at 5). As noted above, however, the issue of a sublicense cannot be resolved at this stage. The Complaint also plausibly alleges that widespread conduct of the type at issue here would cause market harm, which is sufficient at this stage.

Lastly, the defendant argues that the benefits to the public outweigh any loss to the plaintiff. (*See id.*) But without a monetary figure in the record, the court finds this argument to be speculative

18

at this stage. And while the subject matter of the video was of public concern, nothing in the record indicates a lack of public access thereto. (*See, e.g.,* Doc. No. 1 ¶ 17 (video was published); Doc. No. 1-1 (screenshot of publication); Doc. No. 18 at 5 (claiming that the video was published by numerous news outlets and "rebroadcast over 18 thousand times with over 19 million total views"); 25 at 5 n.8 (same).) Therefore, this factor, too, favors the plaintiff.

With only one factor favoring the defendant, a finding of fair use as a matter of law would be inappropriate at this stage. Therefore, Count I will remain pending.

### B. Bond

The defendant asks the court to require the plaintiff to post a bond. In support of its request, the defendant contends that its defenses are strong, that the potential damages in this case are negligible, and that the plaintiff's former counsel has engaged in a pattern of unethical litigation. (*See* Doc. No. 18 at 16–17; Doc. No. 25 at 5 n.9) The defendant also brings to the court's attention a case in which the court required a bond after determining that the plaintiff's current counsel "had not done complete due diligence to determine the bona fides of his client's claims" following the withdrawal of said former counsel. *See Mondragon v. Nosrak*, 500 F. Supp. 3d 1175, 1179 (D. Colo. 2020). In support of its decision, the court mentioned a third-party affidavit supporting the defendant's claim that the lawsuit was meritless and noted the "dubious origins and merit of th[e] case." *Id.* at 1179–80.

This case is distinguishable because there is no indication, at least at this stage, that counsel failed to do due diligence or otherwise engaged in unethical litigation practices. For instance, there is no indication that this lawsuit serves as a mere Trojan horse for abusive settlement demands. *Cf. Mondragon*, 500 F. Supp. 3d 1175 ("[D]espite [former counsel]'s withdrawal from the case, it retains the taint of having its origin in [former counsel]'s volume copyright practice technique of

19

'file first—ask questions later."). In addition, the lawsuit does not appear to be facially frivolous, insofar as the defendant does not deny having used the video. Finally, the defendant does not argue that the plaintiff would be unable to cover costs if so ordered. *See In re Clerk's Fees & Cost Bonds*, 49 F. Supp. 1011, 1012 (M.D. Tenn. 1943) (Davies, J.) ("In cases where a motion to require security for cost is made by opposing parties, the court should in its discretion consider whether or not the rights of the parties might be prejudiced by allowing a party to cause others to incur liability for large amounts of costs without being financially able to indemnify such parties for the amount thereof in the event of being cast in the suit."). Regardless of the actions of the plaintiff's former counsel in other cases, the court is therefore inclined to allow the parties to proceed on a clean slate. In its discretion, the court will thus deny the request for a bond at this time. *See Samarripa v. Ormond*, 917 F.3d 515, 517 (6th Cir. 2019) ("Security for costs falls within a court's broad discretion."). However, the court will not hesitate to reconsider the question should indicia of abusive conduct emerge.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss (Doc. No. 17) will be denied. An appropriate order will enter.

_____
ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE